# CITY OF PORT ARTHUR, TEXAS *v.* UNITED STATES ET AL.

No. 81–708.  Argued October 6, 1982—Decided December 13, 1982

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed a dissenting opinion, in which REHNQUIST and O'CONNOR, JJ., joined, *post*, p. 169.

*Robert Q. Keith* argued the cause for appellant. With him on the briefs was *James Douglas Welch.*

*Carter G. Phillips* argued the cause for appellees. With him on the brief for the United States were *Solicitor General Lee, Assistant Attorney General Reynolds, Deputy Solicitor General Wallace, Jessica Dunsay Silver,* and *Marie E. Klimesz. Elizabeth K. Julian, Michael M. Daniel, William L. Robinson, Norman J. Chachkin, Elizabeth C. Petit,* and *Don Floyd* filed a brief for appellees Douglas et al.

JUSTICE WHITE delivered the opinion of the Court.

Section 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C. § 1973c, requires that when a State or

political subdivision covered by the Act[1] adopts or seeks to administer any change in its standards, practices, or procedures with respect to voting, it must obtain a preclearance either from the Attorney General of the United States or by obtaining a declaratory judgment from the District Court for the District of Columbia that the proposed change has neither the purpose nor the effect of denying or abridging the right to vote on account of race.[2] *Perkins* v. *Matthews*, 400 U. S. 379 (1971), held that changes in the boundary lines of a city by annexations that enlarge the number of eligible voters are events covered by § 5. The question in this case is whether the District Court for the District of Columbia cor-

---

[1] It is undisputed that the city of Port Arthur is a political subdivision to which § 5 is applicable. See 28 CFR, p. 461, Appendix (1982).

[2] Section 5, as set forth in 42 U. S. C. § 1973c, in relevant part provides as follows:

"Whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect . . . such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, or upon good cause shown, to facilitate tate an expedited approval within sixty days after such submission, the Attorney General has affirmatively indicated that such objection will not be made."

rectly held that the electoral plan for the Port Arthur, Tex., City Council could not be approved under § 5 because it insufficiently neutralized the adverse impact upon minority voting strength that resulted from the expansion of the city's borders by two consolidations and an annexation.

I

In December 1977, the city of Port Arthur, Tex., consolidated with the neighboring cities of Pear Ridge and Lake View. Six months later, the city annexed Sabine Pass, an incorporated area. As a result of these expansions of the city's borders, the percentage of the black population in Port Arthur decreased from 45.21% to 40.56%. Blacks of voting age constituted 35% of the population of the enlarged city.[3]

Prior to the expansions, the city was governed by a seven-member Council, including a mayor, each member being elected at large by majority vote. Each member except the mayor was required to reside in a specific district of the city. Members were elected for staggered terms. Following the two consolidations, the City Council passed an ordinance adding an eighth member to the Council, while retaining the at-large system with residency requirements. After the annexation of Sabine Pass, the city further proposed that the Council be expanded to nine members, with at-large elections as before. The two consolidations and the annexation, together with the proposed changes in the governing system, were submitted to the Attorney General for preclearance

---

[3] The preannexation and postannexation percentages are based on the 1980 census. The figure for the percentage of blacks in the voting age population is an estimate, which the District Court derived by extrapolating from the 1970 census data. The 1970 census showed that at that time 34.6% of the voting age population was black while 40.01% of the general population was black. The District Court itself noted the dangers of extrapolation, but explained that both parties had suggested the procedure for determining the percentage of the current voting age population that is black. Port Arthur also has a Hispanic community, which comprises 6.30% of the enlarged city's population.

pursuant to § 5 of the Voting Rights Act. The Attorney General refused preclearance, suggesting, however, that he would reconsider if the Council members were elected from fairly drawn single-member districts.

As § 5 permitted it to do, the city then filed suit in the United States District Court for the District of Columbia seeking a declaratory judgment that the expansions and the nine-member plan did not have the purpose or effect of denying or abridging the right to vote on account of color or race within the meaning of § 5. While that suit was pending, the city approved by referendum the "4–4–1" plan, calling for four members to be elected from single-member districts, four to be elected at large from residency districts identical to the single-member districts, and the ninth member, the mayor, to be elected at large without any residency requirement.[4] That plan, like the previous plans, required a majority vote to elect each Council member. The city then moved to amend its complaint so as to seek a declaratory judgment as to the legality of the 4–4–1 plan.

The District Court concluded that because there were legitimate purposes behind the annexation and the consolidations, those actions, under *City of Richmond* v. *United States*, 422 U. S. 358 (1975), could not be denied preclearance as discriminatory in purpose. 517 F. Supp. 987 (1981). Because the expansions had substantially reduced the relative political strength of the black population, however, it was necessary for preclearance that the postexpansion electoral system be found to satisfy the requirements of § 5. The District Court held that neither the first nine-member plan nor the 4–4–1 plan measured up, not only because each was adopted with a discriminatory purpose, but also because in the context of the severe racial bloc voting characteristic of the recent past in the city neither plan adequately reflected

---

[4] The United States unsuccessfully sought to enjoin the referendum election before a three-judge court in the Eastern District of Texas. *United States* v. *City of Port Arthur*, No. B–80–216–CA (Sept. 5, 1980).

the minority's potential political strength in the enlarged community as required under *City of Rome* v. *United States*, 446 U. S. 156 (1980); *City of Richmond* v. *United States*, *supra;* and *City of Petersburg* v. *United States*, 354 F. Supp. 1021 (DC 1972), summarily aff'd, 410 U. S. 962 (1973).

Soon after this decision, the city and the United States jointly submitted to the court for approval the "4–2–3" electoral plan. Under this scheme, the city would be divided into four single-member districts, Districts 1 through 4. District 5, comprising Districts 1 and 4 would elect another member, as would District 6, which combined Districts 2 and 3. Three additional members would be elected at large, one each from Districts 5 and 6, the third at-large seat to be occupied by the mayor and to have no residency requirement. All Council seats would be governed by the majority-vote rule, that is, runoffs would be required if none of the candidates voted on received a majority of the votes cast. Blacks constituted a majority in Districts 1 and 4, 79% and 62.78% respectively, as well as a 70.83% majority of the fifth district combining the two majority black districts. The sixth district was 10.98% black. Although the United States expressed reservations about the at-large and majority-vote features, its position was that neither of these aspects of the plan warranted a denial of preclearance.

After response to and oral argument upon the submission, the District Court concluded "that the proposed plan insufficiently neutralizes the adverse impact upon minority voting strength which resulted from the expansion of Port Arthur's borders." App. 87a. The court added, however, that if the plan were modified to eliminate the majority-vote requirement with respect to the two nonmayoral, at-large candidates, and to permit election to these two seats to be made by a plurality vote, the court "would consider the defect remedied and offer our approval." *Id.*, at 87a–88a. This appeal followed, the basic submission being that under § 5 and the controlling cases the District Court exceeded its authority in

conditioning clearance of the 4–2–3 plan on the elimination of the majority-vote requirement.[5]  We noted probable jurisdiction.   455 U. S. 917 (1982).

## II

*Perkins* v. *Matthews*, 400 U. S. 379 (1971), held that annexations by a city are subject to § 5 preclearance because increasing the number of eligible voters dilutes the weight of the votes of those to whom the franchise was limited before the annexation and because the right to vote may be denied by dilution or debasement just as effectively as by wholly prohibiting the franchise.   It soon became clear, however, that § 5 was not intended to forbid all expansions of municipal borders that could be said to have diluted the voting power of particular groups in the community.   In *City of Petersburg* v. *United States, supra,* the annexation of an area with a heavy white majority resulted in reducing the black community from majority to minority status.   The District Court held that the annexation could nevertheless be approved but "only on the condition that modifications [in the electoral plan] calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters are adopted, i. e., that the [city] shift from an at-large to a ward system of electing its city councilmen."   354 F. Supp., at 1031.   We affirmed summarily.   410 U. S. 962 (1973).

Later, in *City of Richmond* v. *United States, supra,* we expressly reaffirmed *Petersburg,* recognizing that the Petersburg annexation enhanced the power of the white majority to

[5] The city argues that the District Court was required to approve a plan jointly submitted by the city and the Attorney General.   The Voting Rights Act, however, assigns primary responsibility to the District Court to determine whether a change in voting procedures violates § 5.   Preclearance by the Attorney General may obviate a court suit, but here the Attorney General was acting in the capacity of a litigant when he joined the city in submitting a plan for the court's consideration.   In that posture, neither the Attorney General, the city, nor both of them together could dictate the court's conclusion as to the acceptability of the plan under § 5.

exclude Negroes from the city council but stating that such a consequence "would be satisfactorily obviated if at-large elections were replaced by a ward system of choosing councilmen." 422 U. S., at 370. It was our view that a fairly designed ward plan "would not only prevent the total exclusion of Negroes from membership on the council but would afford them representation reasonably equivalent to their political strength in the enlarged community." *Ibid.* We applied these principles in *City of Richmond.* There, the annexation of a heavily white area reduced the black population of the city from 52% to 42%, and the electoral proposal submitted for preclearance replaced the prior system of at-large elections with a single-member plan under which blacks would be in a substantial majority in four of the nine councilmanic districts. We held that as long as the ward system fairly reflected the strength of the Negro community as it existed after the annexation, preclearance under § 5 should be granted. Under such a plan, "Negro power in the new city [would not be] undervalued, and Negroes [would] not be underrepresented on the council." *Id.,* at 371. The annexation could not, therefore, be said to have the effect of denying or abridging the right to vote on account of race within the meaning of § 5.

In the case before us, Port Arthur was a party to two consolidations and an annexation. Because the areas taken into the city were predominantly white, the relative percentage of blacks in the enlarged city was substantially less than it was before the expansions. The District Court refused preclearance because in its view the postexpansion electoral system did not sufficiently dispel the adverse impact of the expansions on the relative political strength of the black community in Port Arthur. The city submits that this judgment was in error under *Petersburg* and *Richmond.*

*Richmond,* however, involved a fairly drawn, single-member district system that adequately reflected the political strength of the black community in the enlarged city. The

plan was consequently an acceptable response to the annexation's adverse impact on minority voting potential. It does not necessarily follow that the mixed single-member and at-large system at issue in this case sufficiently dispelled the impact of Port Arthur's expansions on the relative political strength of the black community. The District Court concluded that although the 4–2–3 system provided a black majority in three councilmanic districts, it was necessary also to eliminate the majority-vote requirement with respect to the two nonmayoral at-large council positions. For several reasons, we cannot say that the District Court erred in this respect.

First, whether the 4–2–3 plan adequately reflected the political strength of the black minority in the enlarged city is not an issue that is determinable with mathematical precision. Because reasonable minds could differ on the question and because the District Court was sitting as a court of equity seeking to devise a remedy for what otherwise might be a statutory violation, we should not rush to overturn its judgment. Cf. *Swann* v. *Charlotte-Mecklenburg Board of Education*, 402 U. S. 1, 15 (1971).

Second, the 4–2–3 plan undervalued to some extent the political strength of the black community: one-third of the Council seats was to be elected from black majority districts, but blacks constituted 40.56% of the population of the enlarged city and 35% of the voting age population. In light of this fact, eliminating the majority-vote requirement was an understandable adjustment. As the District Court well understood, the majority-vote rule, which forbade election by a plurality, would always require the black candidate in an at-large election, if he survived the initial round, to run against one white candidate. In the context of racial bloc voting prevalent in Port Arthur, the rule would permanently foreclose a black candidate from being elected to an at-large seat. Removal of the requirement, on the other hand, might enhance the chances of blacks to be elected to the two at-large

seats affected by the District Court's conditional order but surely would not guarantee that result. Only if there were two or more white candidates running in a district would a black have any chance of winning election under a plurality system. We cannot say that insisting on eliminating the majority-vote rule in the two at-large districts would either overvalue black voting strength in Port Arthur or be inconsistent with *Richmond*.

Third, even if the 4–2–3 electoral scheme might otherwise be said to reflect the political strength of the minority community, the plan would nevertheless be invalid if adopted for racially discriminatory purposes, *i. e.*, if the majority-vote requirement in the two at-large districts had been imposed for the purpose of excluding blacks from any realistic opportunity to represent those districts or to exercise any influence on Council members elected to those positions. *City of Richmond* v. *United States*, 422 U. S., at 378–379. The District Court made no finding that the 4–2–3 plan was tainted by an impermissible purpose; but it had found that the two preceding plans, the first nine-member plan and the 4–4–1 plan, had been adopted for the illicit purpose of preventing black candidates from winning election. The court had also found that the majority-vote requirement was a major means of effectuating this discriminatory end. When it was then presented with the 4–2–3 plan retaining the requirement for the two nonmayoral at-large seats, the Court conditioned approval on eliminating the majority-vote element. It seems to us that in light of the prior findings of discriminatory purpose such action was a reasonable hedge against the possibility that the 4–2–3 scheme contained a purposefully discriminatory element. On balance, we cannot fault the judgment of the District Court.

The judgment of the District Court is accordingly

*Affirmed.*

JUSTICE POWELL, with whom JUSTICE REHNQUIST and JUSTICE O'CONNOR join, dissenting.

The Court affirms the District Court's order, concluding that although the 4–2–3 plan ensures proportional representation for the black voting age population, a district court nevertheless is free under § 5—in the exercise of a newly perceived equitable jurisdiction—to require a city to "enhance" the chances of increased minority representation on a city's governing body. In this case, the perceived enhancement would be that a plurality, rather than a majority election requirement, would give black citizens a better chance of capturing—in addition to the three district seats assured them—the two at-large seats. *Ante*, at 167–168.[1] Because the Court's decision is irreconcilable with *City of Richmond* v. *United States*, 422 U. S. 358 (1975), and authorizes a standardless equitable jurisdiction in district courts, I dissent.

I

In *City of Richmond*, the city annexed territory reducing the percentage of the city's black population from 52% to 42%. After the Attorney General refused to preclear submitted election plans, he and the city came to an agreement and jointly submitted a plan for approval to the District Court for the District of Columbia. The District Court rejected this plan, because the city had failed to "minimiz[e] the dilution of black voting power to the greatest possible extent." *Id.*, at 367. This Court, in an opinion by JUSTICE WHITE, vacated the District Court's order, holding that a district court must accept a new electoral plan for the enlarged municipality as long as it "fairly reflects the strength of the Negro community as it exists after the annexation" and

---

[1] The Court has recognized that a majority-vote requirement in at-large elections, unless adopted as a change for discriminatory purposes, is a valid and long-accepted practice "that is followed by literally thousands of municipalities and other local governmental units throughout the Nation." See *City of Mobile* v. *Bolden*, 446 U. S. 55, 60 (1980) (plurality opinion).

"would afford [it] representation reasonably equivalent to [its] political strength in the enlarged community." *Id.*, at 370–371. See *City of Rome* v. *United States*, 446 U. S. 156, 187 (1980), aff'g 472 F. Supp. 221, 245 (DC 1979); *City of Rome, supra,* at 188 (BLACKMUN, J., concurring); *United Jewish Organizations* v. *Carey*, 430 U. S. 144, 160 (1977) (opinion of WHITE, J.); *Beer* v. *United States*, 425 U. S. 130, 139, n. 11 (1976). In dissent, JUSTICE BRENNAN stated that he would find the dilutive effect of an annexation cured only by an election plan "calculated to neutralize to the extent possible any adverse effect upon the political participation of black voters." 422 U. S., at 389.

In this case, the city expanded its boundaries by annexation and consolidation.[2] This resulted in reducing the percentage of its black population from 45.21% to 40.56%. The electoral plan for the enlarged city, submitted to the Attorney General under § 5 of the Voting Rights Act of 1965, was disapproved both by the Attorney General and then by the District Court for the District of Columbia. Following negotiations, the Attorney General and the city reached agreement

---

[2] The District Court acknowledged benefits for the entire population from consolidation:

"Port Arthur . . . was extremely interested in maintaining a population in excess of 50,000 so as to remain entitled as a matter of right to funds from federal agencies including the Department of Housing and Urban Development ('HUD'). Were the population to decrease below the 50,000 level, HUD would diminish the amount of the direct grant by one-third each year; in the fourth year, the City would have to [compete] with other applicants for discretionary awards. Since 1975, . . . there was evidence that the municipal population was [declining towards] the 50,000 mark. . . . Having already annexed all of the adjacent black communities, the City turned to Pear Ridge, Lakeview and Griffing Park.

". . . Although the City would be required to provide services to the new residents, it was anticipated that the additional cost would be minimal and greatly outweighed by the increased tax revenue. . . . Furthermore, Port Arthur hoped that the increased visibility resulting from consolidation would attract new businesses and thereby create new jobs." 517 F. Supp. 987, 999 (1981) (footnote omitted).

that the 4–2–3 electoral plan—at issue in this case—complied with the requirements of the Voting Rights Act. Accordingly, the plan was jointly submitted by the Attorney General and the city to the District Court for its approval. Under this plan, the city's 35% black voting age population was assured of 33% of the City Council positions, *i. e.*, three of nine members.

The District Court rejected the agreed upon plan in a brief order because, in words reminiscent of JUSTICE BRENNAN's dissent in *City of Richmond*, it "insufficiently neutralizes the adverse impact upon minority voting strength." App. 87a. The court added, however, that it would approve the plan were it modified "so as to provide for the election of the two non-mayoral, at-large representatives by plurality vote," *ibid.*, a condition to approval that the Attorney General had expressly considered and found not to be required by the Act.

I find the Court's decision in *City of Richmond* and in this case fundamentally inconsistent, because the proportional representation assured by the 4–2–3 plan must, by definition, "afford [blacks] representation reasonably equivalent to their political strength in the enlarged community." 422 U. S., at 370–371. Cf. *United Jewish Organizations, supra,* at 169 (BRENNAN, J., concurring in part) ("[T]he very definition of proportional representation precludes either underrepresentation or overrepresentation . . ."). Apparently in an effort to justify its decision, the Court states that the agreed 4–2–3 plan "undervalued to some extent the political strength of the black community." *Ante,* at 167. No support for this statement is cited, and none is found in the record.[3] The District

---

[3] In interim elections held in 1981, the city's electorate chose three black Council members. In fact, the city notes that it is now governed by a Council consisting of four blacks and five whites. Reply Brief for Appellant 6.

The Court seems to rely on two factors for its conclusion: a slight differential between the percentage of black seats and the percentage of black

Court made no such finding and the Government, in its submission to the District Court, expressly asserted that the city's plan "would appear to provide the minority community with a fair opportunity to obtain 'representation reasonably equivalent to their political strength in the enlarged community.' *City of Richmond* v. *United States,* 422 U. S. 358, 370 (1975)." App. 79a–80a. The black intervenors also agreed at the time of the submission that "the plan does approach affording blacks representation reasonably equivalent to their voting strength in the at-large community . . . ." *Id.,* at 83a.

## II

Furthermore, the Court's decision finds no support in *any* prior decision of this Court. The theory that political

---

voting age population; and a larger differential between the percentage of black seats and the percentage of the black population. There is a preference for voting age population statistics, see *United Jewish Organizations* v. *Carey,* 430 U. S. 144, 164, n. 23 (1977) (opinion of WHITE, J.), because they are more "probative" of the "electoral potential of the minority community," *City of Rome* v. *United States,* 446 U. S. 156, 186, n. 22 (1980), than population statistics. Even if the Court were to rely on population statistics here, this Court's formulations reflect the recognition that it would be unreasonable, if not impossible, to require cities to devise voting plans that afford minorities representation *precisely* proportional to their political strength in the jurisdiction. Indeed, the Court has indicated that proportional representation would be found in circumstances quite similar to those presented here. See *Beer* v. *United States,* 425 U. S. 130, 159, n. 19 (1976) (MARSHALL, J., dissenting) (approving representation/voting age population differential of 6%).

Moreover, the Court's conclusion that the 4–2–3 plan will "permanently foreclose" blacks from being elected to either of the at-large seats, *ante,* at 167, ignores the dynamics of the region, to which the facts of this case attest. With 35% of the voting age population composed of black citizens, it is politically naive to think that these citizens will not have significant—and indeed often decisive—influence in the election of at-large Council members. The results in numerous state and local elections demonstrate the political power of such a large and cohesive segment of the electorate. See J. Wilkinson, Harry Byrd and the Changing Face of Virginia Politics, 1945–1966, p. 346 (1968) ("By the middle of the 1960's . . . Negroes provided balance-of-power ballots [in Virginia and] elsewhere in the South . . .").

strength should be enhanced, rather than preserved, is new doctrine. It is a view Congress has never embraced, and indeed one that the 1982 extension of the Voting Rights Act fairly can be viewed as rejecting.[4] Moreover, although I do not question the power of a district court to disagree with the Attorney General's construction of the Act, it does not follow that the District Court was "sitting as a court of equity," *ante*, at 167, and had the power to require political enhancement. We are interpreting and applying a statute that vests no such open-ended jurisdiction in *any* court.

In the first six months of this year, the Department of Justice received approximately 8,709 applications for preclearance of voting changes under § 5, an average of 66 per working day.[5] Congress, with the approval of the President, has recently reaffirmed the authority of Department of Justice personnel to exercise this extensive control over state and local *political* decisions. The sheer volume of applications for preclearance makes imperative the prescribing of predictable standards. Proportional representation, whatever its theoretical and practical limitations may be in a nation with populations as diverse and mobile as that of the United States, is at least an objective standard, and when it

---

[4] Section 3 of the Voting Rights Act Amendments of 1982, Pub. L. 97–205, 96 Stat. 131, 42 U. S. C. § 1973b (1982 ed.), states that a violation has been established if it is shown, "based on the totality of circumstances," that the political processes "are not equally open to [blacks]." The amendment expressly provides that "[t]he extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered . . . ." The Senate Committee Report stated:

"Electoral devices, including at-large elections, per se would not be subject to attack under Section 2. They would only be vulnerable if, in the totality of circumstances, they resulted in the denial of equal access to the electoral process. [T]he presence of minority elected officials is a recognized indicator of access to the process . . . ." S. Rep. No. 97–417, p. 16 (1982).

[5] See U. S. Dept. of Justice, Civil Rights Division, Voting Rights Section, Number of Changes Submitted under Section 5 and Reviewed by the Department of Justice, By State and Year, 1965—June 30, 1982 (unpublished).

is found to exist in a § 5 case—whether deemed necessary under the Act or not—it should be dispositive. The Court today, however, finds for the first time a standardless equitable discretion in the District Court for the District of Columbia to impose requirements *in addition* to proportional representation. This leaves the responsible authorities in the State and communities under the Act—as well as the Attorney General—without guidance as to the requirements of § 5.

## III

The Court's discussion of discriminatory purpose as providing some support for the District Court's "effects" determination is disquieting for a number of reasons. First, as the Court notes, the District Court made no finding that the 4–2–3 plan was tainted by an impermissible purpose. Second, the District Court expressly found that no discriminatory motive prompted the city's annexation of the three jurisdictions involved. 517 F. Supp. 987, 1019–1021 (DC 1981). Third, the factors that led the District Court to conclude that the earlier 8–0–1 and 4–4–1 plans had been adopted for a discriminatory purpose have no bearing on the question whether the city was similarly motivated when it adopted the 4–2–3 plan at a later time and pursuant to good-faith negotiations with the Attorney General. Finally, the Government concedes that purpose is not a factor in this case.[6] Indeed, the Court fails to explain—nor can it explain satisfactorily—how a plan negotiated with and acceptable to the Attorney General was adopted for a discriminatory purpose.

---

[6] The following exchange took place at oral argument:

"[The Court]: And may I get clear, is purpose still in this case at this level?

"[The Government]: Not in terms of the submission to this Court, no, Your Honor.

"[The Court]: So we consider only the effect?

"[The Government]: Yes, Your Honor. I don't believe that the district court's opinion or order can fairly be read to cast any doubt on the purpose of the plan as adopted." Tr. of Oral Arg. 30.

In my opinion, the city has shown that its 4–2–3 plan has satisfied fully § 5's effect-and-purpose test and the standard adopted in *City of Richmond*.   We now should demand no more.   I would reverse the District Court's order.