Richard BARNETT, et al.,
Plaintiffs–Appellants,

v.

Richard M. DALEY, et al.,
Defendants–Appellees,

and

Carole Bialczak, et al., Defendants–
Intervenors–Appellees.

No. 93–3644.

United States Court of Appeals,
Seventh Circuit.

Argued April 20, 1994.

Decided Aug. 23, 1994.

As Amended Oct. 19, 1994.

Rehearing Denied Nov. 2, 1994.

Judson H. Miner (argued), Barack H. Obama, Davis, Miner, Barnhill & Galland, Nathaniel R. Howse, R. Eugene Pincham, P. Scott Neville, Jr., Howse, Howse, Neville & Gray, Chicago, IL, for plaintiffs-appellants.

Lawrence Rosenthal, DCC, Benna R. Solomon, Andrew S. Mine (argued), Susan S. Sher, Office of the Corp. Counsel, Appeals Div., Chicago, IL, for Richard M. Daley.

Michael Levinson, Lawrence Rosenthal, DCC, Benna R. Solomon, Andrew S. Mine, Susan S. Sher, Office of the Corp. Counsel, Chicago, IL, for City Council of City of Chicago, Board of Election Com'rs of City of Chicago.

Michael Levinson, Lawrence Rosenthal, DCC, Benna R. Solomon, Andrew S. Mine, Susan S. Sher, James M. Scanlon, Rieff & Scanlon, Chicago, IL, for Board of Election Com'rs of City of Chicago.

Jerold S. Solovy, Barry Sullivan, Joel T. Pelz (argued), Thomas C. Buchele, Gar Patterson, Jenner & Block, Richard A. Devine, David A. Bonoma, Pope, Cahill & Devine, Donald Hubert, Hubert and Assoc., Chicago, IL, for Carole Bialczak, Thomas W. Murphy, Patrick Huels, James J. Laski, Anthony C. Laurino, Ginger Rugai, Patrick Levar, John Madrzyk, Theodore Mazola, Lemuel Austin, Jr., Edwin Eisendrath, Edward Burke, William J.P. Banks, Bernard L. Stone, Eugene Schulter, Richard Mell, Mary A. Smith, Ambrosio Medrano, Lorraine L. Dixon, Theris M. Gabinski, Ray Suarez, Burton Natarus, Bernard Hansen, Mark Fary, Michael A. Wojcik, Patrick O'Connor, Brian Doherty, John J. Buchanan.

Brenda Wright, Jaqueline A. Berrien, Lawyers Committee for Civil Rights Under Law, Washington, DC, for Lawyers' Committee for Civil Rights Under Law, amicus curiae.

Roslyn C. Lieb, Cynthia A. Wilson, Chicago Lawyers' Committee, Chicago, IL, for Chicago Lawyers' Committee for Civil Rights Under Law, Inc., amicus curiae.

Before POSNER, Chief Judge, and RIPPLE and KANNE, Circuit Judges.

POSNER, Chief Judge.

The Chicago City Council is composed of 50 aldermen, each elected from a different ward. Illinois law requires that the wards be redistricted after each decennial census. The latest redistricting plan was adopted by referendum (after the Council itself could not agree on a plan) in 1992, and is challenged in this suit by black voters who claim mainly that it violates both the equal protection clause of the Fourteenth Amendment and section 2(b) of the Voting Rights Act, 42

U.S.C. § 1973(b), which offers a remedy to members of a racial or other minority who "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." The district judge dismissed the suit for failure to state a claim. 835 F.Supp. 1063 (N.D.Ill.1993). The only facts on which we can base decision, therefore, are those in the plaintiffs' last amended complaint, which superseded their previous pleadings, *Prymer v. Ogden*, 29 F.3d 1208, 1215 n. 6 (7th Cir. 1994); *Manning v. Ashland Oil Co.*, 721 F.2d 192, 197 (7th Cir.1983); *Ferdik v. Bonzelet*, 963 F.2d 1258, 1262 (9th Cir.1992), plus facts (census population figures, for example) of which we can take judicial notice.

The challenged plan creates 23 wards in which whites have at least a bare majority of either the total or the voting-age population, 19 in which blacks have at least a 65 percent majority of the total population and 1 in which they have 55 percent, and 7 in which Hispanics have at least a 65 percent majority. The reason for conceiving "majority" differently for whites on the one hand and blacks and Hispanics on the other is that the latter groups have a younger age distribution and therefore a lower percentage of voting-age members, and also lower voter registration and turnout among those who are of voting age. The rule of thumb is that these groups must have at least a 65 percent majority in the electoral district in order to have a reasonable assurance of being able to elect a candidate of their choice. *United Jewish Organizations v. Carey*, 430 U.S. 144, 164, 97 S.Ct. 996, 1009, 51 L.Ed.2d 229 (1977) (plurality opinion); *Ketchum v. Byrne*, 740 F.2d 1398, 1416 (7th Cir.1984). The complaint alleges that no black aldermanic candidate in Chicago has ever beaten a white in a ward that had a black majority of less than 62.6 percent, and it is emphatic that the ward in which the population is 55 percent black is not a black ward—is indeed a white ward, even though only 42 percent of its population is white.

The 19 black supermajority wards are 38 percent of the total number of wards, a figure only slightly less than the percentage of the Chicago population that is black—38.6

percent. The 23 white majority wards constitute 46 percent of the total number of wards, a figure that substantially exceeds the percentage of the Chicago population that is white, which is 37.9 percent. Hispanics, with 19.6 percent of the population, have only 14 percent of the wards—and they have a separate suit pending in the district court challenging the redistricting plan as unfair to them. (We have not discovered why the two suits have not been consolidated.) The white advantage over blacks is much smaller if voting-age population rather than total population is used for comparison with the ward percentages, and later we shall consider which is the superior benchmark.

The complaint alleges that a ward map could be drawn that would create 24 black supermajority wards. Because such a map would grossly short change the other racial groups by giving blacks, who have less than 39 percent of the city's population, 48 percent of the wards, the plaintiffs do not insist on the maximum possible number of black supermajority wards. But they do want parity with whites and they point out that the ward map they are challenging—the map the electorate adopted by referendum—gives the white population, although smaller than the black, 23 wards to only 19 for the blacks. The complaint charges that the mayor and administration aldermen, who proposed that map, deliberately drew it in such a way that it would protect white incumbents. A reasonable compromise, the plaintiffs suggest, would be a plan that created 22 black wards, 21 white wards, and 7 Hispanic wards.

■ The complaint charges, as we have said, violations of both the equal protection clause and the Voting Rights Act. It will simplify exposition to discuss the two violations separately, and to begin with the equal protection clause. Here (as under the Fifteenth Amendment, see *City of Mobile v. Belden*, 446 U.S. 55, 62, 100 S.Ct. 1490, 1497, 64 L.Ed.2d 47 (1980) (plurality opinion), on which the plaintiffs also rely, though its applicability to a case such as this is unsettled, *Voinovich v. Quilter*, — U.S. —, —, 113 S.Ct. 1149, 1158, 122 L.Ed.2d 500 (1993)) the plaintiffs cannot succeed without proving *intentional* racial discrimination. *Washing-*

ton v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Tucker v. U.S. Dept. of Commerce,* 958 F.2d 1411, 1414 (7th Cir. 1992). Desire to protect incumbents as such is, of course, not a form of racial discrimination, and it may have been the dominant desire actuating the redistricting plan challenged in this case. If, however, in order to protect incumbents of whatever race the redistricting authority deliberately adopted devices for limiting black representation (maybe because white incumbents were thought particularly vulnerable to challenge at the next election), they would be engaged in deliberate racial discrimination. *Ketchum v. Byrne, supra,* 740 F.2d at 1408. The fact that discrimination may have an ulterior motive that is not discriminatory does not make it any the less intentional, as would be obvious if the ulterior motive were not to protect incumbents but to promote racial harmony, by forbidding all association between the races.

We may assume, because the complaint so alleges and it is all we have, that the defendants were indeed trying to keep the number of black wards to 19. Such a motive is racial. Yet to say that may not seem to say much, and this for two reasons. First, the complaint makes no allegations concerning the motives of the voters who voted for the administration plan in the referendum. It could be argued that since the defendants merely proposed, and the electorate disposed, the relevant motives would be those of the voters (about which the complaint is silent). See *Arthur v. City of Toledo,* 782 F.2d 565 (6th Cir.1986), and cases cited there. But the defendants do not argue this. Though permitted, *Massachusetts Mutual Life Ins. Co. v. Ludwig,* 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976) (per curiam); *Singletary v. Continental Illinois National Bank & Trust Co.,* 9 F.3d 1236, 1240 (7th Cir.1993), they were not obliged, *Jackson v. Norris,* 748 F.Supp. 570, 571 (M.D.Tenn.1990), to defend the judgment on grounds other than those adopted by the district judge; so they are free to advance the argument in the district court (not having waived it in that court) in the further proceedings on remand that we shall be ordering. But the argument's merit or lack thereof is not so clear that we could feel comfortable addressing it when it has not even been briefed.

Second, the racial motive alleged here could not be considered racist—could not, that is, be considered racial in an invidious sense—if the creation of additional black wards would violate the rights of the city's other major racial groups, the whites and Hispanics. With exceptions not argued to be relevant to this case, the equal protection clause does not countenance reverse discrimination. A redistricting authority cannot, in order to maximize the voting power of blacks, ignore the effect on other groups; and to that extent awareness of race cannot be banished from the redistricting process or thought to establish, without more, a denial of equal protection. Since the Hispanics have their own suit we can limit our consideration to a comparison of the white and black wards; and although the suggestion that a ward which is 42 percent white is a "white majority ward" seems strained, we must accept it (given the procedural posture—a complaint dismissed on its face) for purposes of our decision. We must therefore compare a plan that creates 22 black and 21 white wards with the administration plan, which creates 19 black and 24 white wards (counting the ward that is only 42 percent white). If the administration plan is no more "white" than is necessary to achieve racial equity in a multiracial polity, it cannot be considered racially discriminatory in a legally relevant sense.

The plaintiffs' suggested compromise map would give blacks, who have less than 39 percent of the city's population, 44 percent of the wards, compared to the administration plan, which gives them 38 percent. And because the black voting-age population is only 35.7 percent of the city's total voting-age population, blacks would control a much larger percentage of wards than there are blacks even theoretically entitled to vote (44 percent versus less than 36 percent), that is, without considering how many are actually registered. The administration plan is favorable to the whites but, at least when comparison is based on voting-age population, at the expense of Hispanics and other minorities

**1200**

rather than of blacks. For the plan gives blacks a larger percentage of the wards than their percentage of the voting-age population (38 percent versus 35.7 percent), gives whites 48 percent of the wards with 43.5 percent of the voting-age population, but gives Hispanics only 14 percent of the wards although they have 16.8 percent of the voting-age population. The ratio of the percentage of wards to the percentage of voting-age population is 1.06 for blacks and 1.10 for whites, which is a small difference. A further point is that the concept of a supermajority electoral district implies that, even when there is no discrimination at all, a group which for whatever reason requires such districts in order to be able to elect candidates of its choice will control fewer districts than a group of the same size which requires only a normal majority, simply because the latter group can spread its votes over more districts without losing control.

The plaintiffs do not deny that the administration plan enables blacks to elect aldermen in proportion to the black population of Chicago—disproportion, if voting-age population is used as the benchmark. (Or number of voters actually eligible, that is, registered voters, but that is not suggested, presumably because blacks' low registration rate may be in part a legacy of past discrimination. *Burns v. Richardson,* 384 U.S. 73, 92–93, 86 S.Ct. 1286, 1296–97, 16 L.Ed.2d 376 (1966).) The plaintiffs' argument is that while the plan may treat blacks fairly when it is considered in isolation, it treats them unfairly in comparison to its treatment of whites. The figures in the preceding paragraph suggest that this is incorrect and that even if it is correct the wrong, if it is a wrong, is a wrong to some other group. The blacks are getting all the representation that is their due. If the whites are getting more than their due, it must be at the expense of other groups, whether those like the Asians and the American Indians that are too small and scattered to elect anyone, or the Hispanics, who have their own lawsuit in which the disparity can be corrected and white domination thus overthrown without giving blacks more than their due and crushing Hispanics and other non-black minorities between a white upper millstone and a black nether millstone.

But this analysis is too simple. To begin with, total population may be a better index to adequacy of representation than voting-age population. ("May be," not "is"; we do not undertake to resolve the issue, only lightly touched on in the briefs.) Children are citizens; their interests are entitled to be considered by politicians, and this is more likely to happen if total rather than voting-age population is used in determining compliance with the equal protection clause, as it is in taking the census. *Franklin v. Massachusetts,* — U.S. —, —, 112 S.Ct. 2767, 2771, 120 L.Ed.2d 636 (1992); *Tucker v. U.S. Dept. of Commerce, supra,* 958 F.2d at 1412. For then the voting power of parents of minor children is amplified, giving such children a modest measure of representation in the political process. (It *is* representation, though indirect and incomplete, because parents normally consider the welfare of their children in making decisions, presumably including decisions on how to vote.) The challenged ward map overrepresents whites at the expense of blacks as well as Hispanics if total rather than voting-age population is the index of representativeness. The underrepresentation of Hispanics cannot be a decisive rejoinder to the plaintiffs' objection to the administration plan because sheer population cannot be the only determinant of districting. The less geographically concentrated a group is, as we have noted, the more difficult it is to create a district or districts that will have a majority or supermajority of the group. For example, were there 10,000 Filipinos in every congressional district in the United States there could not be a Filipino majority district even though the nation's total Filipino population would exceed that of any congressional district. Cf. *U.S. Dept. of Commerce v. Montana,* — U.S. —, —, 112 S.Ct. 1415, 1418, 118 L.Ed.2d 87 (1992).

■ Blacks and whites in Chicago (often said, with what truth we do not know, to be the most racially segregated city in the United States) live in highly compact areas, making it easy to carve wards in which one group or the other has a majority or supermajority. Hispanics and Asians, the remaining racial groups that receive consideration under the Voting Rights Act, are more scattered and

that may be why the challenged redistricting plan gave the Asians no majority district and the Hispanics fewer majority districts than their population alone would warrant. When geographical distribution is factored into the analysis, therefore, it is entirely possible that one or more racial or ethnic groups, here both blacks and whites, would be overrepresented in the City Council no matter how neutral the designers of the ward map were. The plaintiffs' essential argument is that the defendants created a map that would give whites *more* overrepresentation than blacks, thus magnifying the political power of whites vis-à-vis blacks, and that they did this intending to diminish the voting strength of blacks. They gave whites, who have only 38 percent of the population, 46 percent of the wards (8 percent over) and blacks, who have 39 percent of the population, 38 percent of the wards (1 percent under, for a total disparity of 9 percent). In contrast, the plaintiffs' suggested compromise would give the blacks 44 percent of the wards (6 percent over) and the whites 42 percent (4 percent over, for a total disparity of 2 percent). The charge is thus racial gerrymandering, which has been unlawful under the equal protection clause since *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and the proposed remedy, while it would overcorrect in favor of blacks, would narrow the gap between the winners and the losers. That at least is true if total rather than voting-age population is used to assess the degree of overcorrection. There may be an alternative plan under which neither group would be more overrepresented than the other even if voting-age rather than total population were used as the benchmark. This is an issue for the remedial phase of the case, which is still in the future.

■ We are mindful that *Burns v. Richardson, supra*, 384 U.S. at 82, 91–92, 86 S.Ct. at 1291, 1295–97, says that states can use voting-age population rather than total population in redistricting. But that was not a race case. The issue in our case is whether, supposing the defendants deliberately set about to limit black voting strength, they were justified in doing so because otherwise they would be infringing the constitutional rights of whites. No one has suggested that

whites have a constitutional right to a scheme of redistricting that gives them voting strength proportional to their voting-age population as opposed to their total population. The whole point in *Burns* was that states should have some flexibility in deciding upon a measure of voting strength for purposes of bringing about equality through redistricting. Redistricting on the basis of voting-age population is not unconstitutional per se, but racially motivated redistricting is not privileged merely because the same pattern might have been brought about by a lawfully motivated scheme of redistricting.

An example may help to clarify our basic point—that the plaintiffs are charging a form of racial gerrymandering. Blacks, let us suppose, are 40 percent of the relevant population, whites 40 percent, and the other 20 percent are scattered among a multitude of small groups none of which is sufficiently large and compact to control even a single ward. The white-dominated city government creates a ward map that has 20 black wards and 30 white wards, and it does this consciously, deliberately, to assure continued white domination of the government. The blacks would control as many wards as they had population, yet their realistic opportunity to participate in the political process would be curtailed, and on racial grounds. Such a case would state a claim under the equal protection clause, and our case is close enough to do so as well. The plaintiffs' claim may have no merit, of course, but all we decide today is that it does not fail on its face.

■ We next consider whether the plaintiffs may also have a claim under the Voting Rights Act. They need not prove intentional discrimination here. *Chisom v. Roemer*, 501 U.S. 380, 394–96, 111 S.Ct. 2354, 2364, 115 L.Ed.2d 348 (1991). And since they may fail in their effort to prove it, their claim under the Voting Rights Act is not academic; they need it as a backup to their equal protection claim, which requires proof of intentional discrimination. We wish we knew exactly what a plaintiff must prove in order to prevail under the Voting Rights Act. Section 2(b), 42 U.S.C. § 1973(b), directs the trier of fact

to consider "the totality of circumstances," and the judicial glosses on this vague phrase do not provide clear guidance. We cannot be much more precise than to suggest that the plaintiffs will have to prove that the challenged plan unreasonably dilutes the voting strength of the black population of Chicago. We have added "unreasonably" to the usual judicial glosses of section 2(b) (e.g., *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *McNeil v. Springfield Park District*, 851 F.2d 937 (7th Cir.1988)), to underscore the fact that the geographical distribution of a population as well as the legitimate claims of other racial or ethnic groups may make it impossible to give each racial group voting power proportional to its share of the total or voting-age population.

We shall not try to decide, with the case in so preliminary a posture, whether the benchmark shall be total rather than voting-age population; the briefs, as we mentioned in discussing the parallel issue under the equal protection clause, barely touch on the issue. The question which measure is better—a question that need not be decided identically under the equal protection clause and the Voting Rights Act—was expressly left open in *Johnson v. DeGrandy*, — U.S. —, — n. 14, 114 S.Ct. 2647, 2660 n. 14, 129 L.Ed.2d 775 (1994). Earlier cases, illustrated by *City of Rome v. United States*, 446 U.S. 156, 186, 100 S.Ct. 1548, 1566, 64 L.Ed.2d 119 (1980), and *City of Port Arthur v. United States*, 459 U.S. 159, 166–67, 103 S.Ct. 530, 534–35, 74 L.Ed.2d 334 (1982), had seemed to use the measures interchangeably. The statutory language leans in favor of voting-age population ("... than *other members of the electorate* ..."), but we are not prepared to pronounce it conclusive on the question, in view of the argument sketched earlier for why total population might be the better index because it would give some, albeit oblique, representation to children from minority groups.

■ What is clear is that the fact that the administration plan gives black voters representation proportional to their share of the population (whether total or voting-age) is not a complete defense under the Voting Rights Act. The Supreme Court's recent decision in *Johnson v. DeGrandy, supra*, — U.S. at — – —, 114 S.Ct. at 2659–62, makes this clear, and while an earlier decision of ours holds that proportionality of representation is a defense when the plaintiff is not alleging *intentional* discrimination, *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 360 (7th Cir.1992), this distinction is not found in *DeGrandy*. It is, indeed, no longer clear that intent plays *any* role in a suit under section 2 of the Voting Rights Act, in which event *DeGrandy* could not possibly be so limited. See *Voinovich v. Quilter, supra*, — U.S. at —, 113 S.Ct. at 1157 (1993); *Chisom v. Roemer, supra*, 501 U.S. at 404–07, 111 S.Ct. at 2369–70 (1991) (dissenting opinion). Clearly, intent is not required, but it could still be usable, to prove a violation that could not be inferred from a discriminatory effect. That is the difference between disparate treatment and disparate impact as theories of violation of Title VII of the Civil Rights Act of 1964—the former requiring proof of intentional discrimination, the latter merely proof of an unreasonable though not necessarily an intended discriminatory effect—and the dichotomy may have a parallel in the Voting Rights Act. We need not decide. It would change nothing in this case. If the plaintiffs can prove intent, they don't need the Voting Rights Act; they will have a complete remedy under the equal protection clause. And if they can't prove intent, and must fall back on the Act, and effects are all that matter under the Act, still we do not think that proportionality of representation is *necessarily*, or in this case, a defense. This case is different from *Baird* because the effect with which the plaintiffs are concerned is not that the challenged ward map fails to give them proportional representation in the City Council, in which case proof that it did give them proportional representation would defeat their claim, but that the map is unnecessarily (even if not deliberately) configured to enable another racial group to dominate the Council. To such a charge, proportionality of representation is not a defense.

We are far from suggesting that an actual violation either of the Voting Rights Act or of the equal protection clause occurred in this case. Apart from whether the plaintiffs can

actually prove their allegations, the present case is less extreme than our hypothetical one even when total rather than voting-age population is used as the benchmark for determining disproportion. And, as in any equity case, should a violation be established, the district court in formulating the remedy will have to consider most carefully the impact on the legitimate interests of all affected groups. *In re Envirodyne Industries, Inc.,* 29 F.3d 301, 302 (7th Cir.1994). To this end the feasibility of consolidating the Hispanics' case with the present case should be carefully explored, as it appears that the principal group that potentially would be affected adversely by a remedial decree in this case would be Chicago's Hispanic community. Maybe nothing better than the administration plan is possible if due regard is given to the interests of groups other than whites and blacks.

But these are not issues for today, and we do not mean to intimate a conclusion as to how they should be resolved. If, as we think has been adequately alleged, the defendants have on racial grounds created fewer black wards than a racially unbiased redistricting authority, mindful of the limitations imposed by geography on any effort to give each and every racial or ethnic group, adequate representation, would do, the complaint states a claim under the Constitution. And if, though the motives for the administration plan were not racial, its consequences are to give one racial group more voting power than it would have under a plan carefully drafted to give all ethnic groups (so far as possible) voting power proportional to their population, the complaint may state a claim under the Voting Rights Act as well. We are being deliberately tentative, because this case tests the outer limits of minority rights in redistricting situations. But we think it was premature to dismiss the case on the complaint. The judgment must therefore be reversed and the case remanded to the district court for further proceedings.

REVERSED AND REMANDED.