896 F.Supp. 929 (1995)
William L. CLAY, John F. Bass, and Louis H. Ford, Plaintiffs,
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, Penelope Alcott, Thomas S. Bugel, Louis P. Fister, Nancy L. Hagen, Earl P. Holt, III, Shirley Walker Kiel, John P. Mahoney, Gwen Moore, Earl E. Nance, Jr., Marjorie R. Smith, and Joyce M. Thomas,[1] Defendants.
No. 91-636C(8).
United States District Court, E.D. Missouri, Eastern Division.
August 9, 1995.
*930 *931 Leo V. Garvin, Jr., St. Louis, MO, for plaintiffs.
Kenneth C. Broston, St. Louis, MO, for defendants.

MEMORANDUM OPINION
STOHR, District Judge.
Plaintiffs initiated this action on April 1, 1991, alleging that the at-large election system used to elect members of the Board of Education of the City of St. Louis (the "Board") violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, and the Fourteenth *932 and Fifteenth Amendments to the United States Constitution, by effectively denying African-American minority voters in the City of St. Louis an equal opportunity to participate in the political process and to elect representatives of their choice to the Board. Plaintiffs seek declaratory relief and an injunction requiring that "districts be fairly drawn for each of the twelve positions on the Board of Education for the City of St. Louis." Complaint, p. 7. Notice of this action was served upon the Missouri Attorney General in 1991 to enable him to be heard in defense of the at-large voting system. He chose not to join in the litigation.
After being assigned to two other judges and after various requests from both parties for continuances, the matter was tried before the Court, sitting without a jury, on April 10, 1995. After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court makes the following findings of fact and conclusions of law.

I. FINDINGS OF FACT
1. Plaintiffs William L. Clay, Jr. and Louis H. Ford are African-American citizens of the United States and registered voters residing within the City of St. Louis, State of Missouri. Plaintiff John F. Bass is an African-American citizen of the United States currently residing in the District of Columbia but registered to vote in the City of St. Louis.
2. Defendant Board of Education of the City of St. Louis (the "Board") is a metropolitan school district organized pursuant to R.S.Mo. § 162.571 et seq.
3. The Board is comprised of twelve members elected from the City at-large on a general ticket.
4. The at-large electoral system is provided for by R.S.Mo. § 162.581.1, thus the Missouri State Legislature, not the Board, possesses the authority to change the manner in which the Board's members are elected.
5. Four Board members are elected at each municipal general election held on the first Tuesday in April of each odd-numbered year. The winners in each election are the four receiving the most number of votes. Such an election procedure in which the winners are those receiving the most votes, without regard to the fact that none of those candidates may have received a majority of the votes cast, is referred to as a plurality vote method. The members are elected to six year terms.
6. Because four members are elected every two years, voters have the option of "bullet voting," in which a voter casts fewer than all four votes which he or she is permitted to cast, in an effort to enhance the significance of the vote(s) he or she does cast. Rarely do voters in a Board election cast all four of their votes.
7. Any vacancy which might occur on the Board is filled by appointment of the Mayor of the City of St. Louis, and those appointed serve until the next biennial general election.
8. The Board is presently comprised of Dr. John P. Mahoney, Eddie G. Davis, Rev. Earl E. Nance, Jr., James F. Metzler, R. William Purdy, Pauline V. Smith, Robbyn G. Stewart, Thomas M. Nolan, Dr. Albert E. Bender, Sr., Hattie R. Jackson, Renni Shuter, Madye Whitehead and Marybeth McBryan.
9. Davis, Nance, Smith, Jackson and Whitehead are African-Americans. The remaining seven members are white.
10. The St. Louis School District was established in 1833. From that time until 1887, members were elected to the Board in partisan elections from districts. Two members were elected from each Ward of the City. Candidates were selected at Ward primary meetings.
11. In 1887, the Circuit Court of the City of St. Louis divided the City into fourteen school board election districts, each composed of two contiguous Wards. Each of the new districts was allowed one representative on the newly formed Board. In addition to the fourteen district members, the Court provided for seven additional members who ran for election at-large.
12. In 1889, the Missouri General Assembly enacted legislation providing for the election of school directors in cities of 500,000 or *933 more persons. That process remains in effect today.
13. The General Assembly changed the size of the Board to its present size of twelve members in 1897, and further provided that all members be elected at-large. This system of electing members to the Board has continued in essentially the same form until the present time, with only minor changes relating to reductions in the minimum age requirement for members.
14. The "All City Slate" was formed as a non-partisan slating group for Board elections in 1989. A "slating group" is a group of individuals who select candidates to run as a bloc to fill seats which are currently up for election. The 1989 slating group was comprised of Dorothy Springer, Eddie Davis, John Mahoney, Rev. Earl Nance, Jr. and Gwendolyn Moore. Davis, Nance and Moore are African-Americans. The other two members of the group are white.
15. In 1991, a non-partisan slating group, called the "Alliance for Quality Education," also known as "Neighbors 4 Candidates 4 Kids," was formed. Samuel Hays, III and Ronald Thompson were the co-chairmen. The other members were Franke Freeman, Emory Kesteloot, Sister Marie Charles, James Metzler, Jamala Rogers, Mary Franklin, Al Kerth, Jim Buford, Rev. Samuel Hylton, Ann Auer, Ronald Smith, Jamie Rivers and Roberta Smith. Thompson, Freeman, Rogers, Franklin, Buford, Hylton and Ronald Smith are African-Americans. The remaining members of the group are white.
16. In 1993, a non-partisan slating group, identified as "Citizens Advocating Responsibility in Education" was formed. This slating group included Rev. Samuel Hylton, William Purdy, Father William Chapman, Dan Kirner, Rev. Rick Lay, James Metzler, Robbyn Stewart, Paula Smith and Eddie Davis. Hylton, Smith and Davis are African-Americans.
17. The 1990 U.S. Census reported the total population of the City of St. Louis to be 396,685. The population is reported as 50.9% white; 47.5% African-American; and 1.6% Other.
18. The City of St. Louis is comprised of twenty-eight political wards. Each ward consists of several precincts, as determined by the Board of Aldermen of the City of St. Louis.
19. Approximately 73.6% of the City of St. Louis' African-American population is concentrated on the City's "north side" in eleven "African-American Wards," Wards 1, 3, 4, 5, 18-22, 26 and 27. The "African-American Wards" have long had an African-American populations of more than 95%.
20. The majority of the white population in the City of St. Louis, 93%, is concentrated in the eleven historically "White Wards," Wards 9-16 and 23-25, which are located on the City's "south side." The "White Wards" have long had white populations of more than 90%.
21. There are also six "mixed wards" within the City's boundaries. Approximately 89,979 people reside in these mixed wards. The population in the mixed wards is 49.74% white, 47.77% African-American, and 2.49% other.
22. African-Americans comprise 42.7% of the voting age (18 years and older) population within the City.
23. For the 1993-1994 school year, student enrollment in the public school district was 78.9% African-American, 19.3% white, and 1.7% other.
24. The City of St. Louis is governed by a Board of Aldermen. There are twenty-eight aldermen, one from each Ward in the City. Eleven of the twenty-eight aldermen, or 39%, are African-Americans, representing Wards on the City's north side.
25. African-Americans hold seven of the City's fifteen seats, or 46%, in the Missouri House of Representatives; and two of the four State Senators from the City are African-Americans.
26. One of the City's two representatives in the United States House of Representatives is an African-American, and two of the most important City offices, the Mayor's Office and the Office of the Comptroller, are held by African-Americans.
*934 27. The School Board is the only multi-member public office in the City of St. Louis which is elected at large.
28. Prior to the commencement of this action, the Missouri General Assembly adopted legislation which provided for the election of School Board members by district. However, the Governor vetoed the bill on July 11, 1991.
29. The preferred candidate of the minority group is not necessarily an African-American.
30. Defendant's expert, Ronald E. Weber, is the Wilder Crane Professor of Government at the University of Wisconsin. Dr. Weber has consulted and/or offered expert testimony in approximately twenty-five cases involving the Act. For purposes of his analysis in this case, Dr. Weber relied on precinct level data.
31. Dr. Weber performed a bivariate ecological regression analysis ("BERA"). A BERA treats the percentage of the total vote won by each candidate in a given precinct as a dependent variable and the percentage of the precinct's voting age population which is African-American or white as the independent variable. This method of analysis is commonly referred to as a double regression analysis, because two regressions are performed. One regression is performed with the percentage of voting age population who are African-American as the independent variable, and the other regression is performed with the percentage of voting age population who are white as the independent variable.
32. When each data point is plotted, known as a scatter plot, a regression curve can be drawn through the points. This regression curve or regression line will have a slope or "b" coefficient, which measures the degree of change in the dependent variable produced by one unit change in the independent variable.
33. The regression curve will intercept both the left and right vertical axes. The points where the curve intercepts the axes, know as the intercept points, provide a statistical approximation of the percentages of white and African-American voters voting for a particular candidate. For example, for a regression equation in which the independent variable, located on the horizontal axis, is the percentage of voting age population who are African-American, the curve's intercept through the left vertical axis, which represents the independent variable  percentage of the total vote received by the candidate, constitutes an estimate of the percentage of voters turning out to vote or supporting a candidate in a precinct with no African-American voters. This resulting estimate constitutes an approximation of the number of white voters supporting a given candidate. In other words, as the percentage of African-American voters approaches zero, any votes received by the given candidate must have come from white voters. The percentage of the population in the City of St. Louis classified as "Other" is so small that it makes no appreciable difference in reaching this conclusion.
34. A correlation coefficient, also referred to as the "r" statistic or "r" factor, measures the strength of the relationship between the dependent and independent variables. The "r" may range from 0.0, indicating the two variables are independent, to + 1.0, indicating the two variables are perfectly correlated in a positive direction.
35. Statistical significance, or the "R2 factor," is a figure calculated for each correlation coefficient, indicating the probability that the coefficient is true or non-random. A coefficient which is statistically significant at the .05 level is considered true or not random in 95 out of 100 instances. Similarly, a coefficient which is deemed statistically significant at the .01 level is considered true in 99 out of 100 instances.
36. Because voters can cast as many as four votes, defendant's expert prepared both "unweighted" and "weighted" cohesion and polarization analyses. In an "unweighted" analysis, each precinct is treated as an equal unit in determining the correlation coefficient, levels of statistical significance, and the intercepts, regardless of the number of votes actually cast in that precinct or the size of the voting age population in that precinct. In contrast, the "weighted" analysis reflects differences in the number of votes actually *935 cast and the size of the voting age population in a given precinct. The "weighted" average permits the impact that each precinct has on the values of the statistical coefficients to vary by the number of persons of voting age in that precinct. The weighted and unweighted estimates both yield the same estimates concerning voter activities and preferences.
37. For purposes of the cohesion and polarization analyses, Dr. Weber defines strong cohesion in a multi-candidate race as the situation where the front running candidate gets at least 80% or more of the vote from among the two front running candidates. Moderate cohesion is the condition where the front-running candidate obtains between 60% and 79.9% of the vote from among the two front running candidates.
38. Strong polarization is defined in Dr. Weber's report as the occasions when both the African-American and white groups are strongly cohesive and prefer different candidates. Moderate polarization is defined as the occasion when one or both the African-American and white groups are moderately cohesive and support different candidates.
39. Dr. Weber characterizes the top four candidates in any given Board election, presuming four seats are up for election, as being the preferred candidates of the particular racial group whose election data is being analyzed.
40. Dr. Weber also performed an extreme case or homogenous precinct analysis. A precinct is deemed homogenous if at least 90% of the voting age population in the precinct is of one race. In an extreme case analysis, the preferences of all of the voters in the predominantly one-race precincts are summed to gain an estimate of the candidate support by the voters of that race.
41. Plaintiffs' expert, Kenneth F. Warren, is a Professor of Political Science at St. Louis University. He has testified in five other cases involving challenges under § 2 of the Act. However, none of those cases involved a challenge to an at-large election system. Dr. Warren was retained by plaintiffs on a contingency fee basis and testified that his compensation for services was dependent upon whether plaintiffs prevail in this action.
42. Dr. Warren performed a homogeneous analysis using graphic displays. This approach relies on data from "ward clusters" and graphically represents, among other things, the number of votes received by a candidate of a given race in a ward of a particular racial composition. However, Dr. Warren does not specifically identify the minority-preferred candidates for any given election, nor does his report set forth concrete criteria for classifying voter conduct in any election as polarized and/or cohesive.
43. In every Board election between 1977 and 1991 and in the 1995 election, white voter turnout has exceeded African-American voter turnout. However, this difference has diminished over time.
44. From 1981 through 1993, a total of thirty-five elections for eleven different city-wide offices were conducted. An African-American candidate won in 31.4% of those elections. These victories by minority candidates included at least two of the most important and powerful city offices, the Mayor's office and the Comptroller's office.
45. Candidates preferred by African-American voters won 57.9% or twenty-two of the thirty-eight contested Board seats during the period 1977 through 1995. In only 42.1%, or sixteen, elections, was the minority-preferred candidate defeated.
46. During the period 1986-1993, the African-American preferred candidate won 56.3% of the sixteen instances when a city-wide office was filled through an election involving at least one African-American candidate. There were actually twenty-one contested elections during this period, however, the only meaningful contest is the primary election, since the winner of the democratic primary is almost always elected to office in the general election.
47. In the eleven Board elections conducted between 1977 and 1995, in which thirty-eight seats on the Board were available, African-American voters were strongly cohesive in three elections (1991 and both 1989 elections), moderately cohesive in one election (the election for a two year position in *936 1977), and uncohesive in the remaining elections. During the same period, white voters were never strongly cohesive, they were moderately cohesive in four elections (1991, both 1989 elections, and the election for a two year position in 1977), and uncohesive in the remaining seven elections (1995, 1993, XXXX-XXXX). In only three of those elections, 1991 and both 1989 elections, were African-American and white voters polarized.
48. In the twenty-one contested general and primary elections conducted during the period 1986-1993 for various exogenous, single-member offices, African-American voters were strongly cohesive in fourteen elections, moderately cohesive in six elections, and uncohesive in one election. During the same period, white voters were strongly cohesive in four elections, moderately cohesive in ten elections and uncohesive in seven elections. African-American and white voters were strongly polarized in two elections, moderately polarized in ten elections, and not polarized in the remaining elections. The candidate of choice among African-American voters was defeated seven times out of twenty-one contested elections.
49. If the data is viewed differently, such that when a candidate is nominated in the primary and elected in the general election, this counts as only one opportunity to win the office, the African-American preferred candidate is elected in nine out of fourteen possible elections or 64.3% of the time. In only five elections, or 35.7% of the time, is the candidate preferred by African-American voters unsuccessful. Finally, in all ten elections where African-American voters were strongly cohesive, their preferred candidate was elected seven out of ten times, or 70% of the time.
50. In the ten Board elections when African-American voters acted either strongly or moderately cohesively, the candidate preferred by African-American voters was elected in eight out of ten elections or 80% of the time.
51. After the 1995 election, African-Americans held five Board seats and thus comprised 42% of the Board. This figure is proportionate to percentage of African-Americans in the voting age population, 42.7%.

II. CONCLUSIONS OF LAW
In 1982, Congress amended § 2 of the Voting Rights Act (the "Act") to prohibit not only those voting practices directly proscribed by the Fifteenth Amendment but also any voting practice or procedure "imposed or applied ... in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a).[2] The 1982 amendment added subsection (b) to § 2 and was aimed particularly at discriminatory at-large election systems which dilute minority voting strength. H.R.Rep. No. 227, 97th Cong., 1st Sess. 18 (1981); S.Rep. No. 417, 97th Cong., 2d Sess. 30, 38-39 (1982), reprinted in 1982 U.S.Code Cong. & Ad.News 177, 206-07. See also United States v. Marengo County Comm'n, 731 F.2d 1546, 1553 (11th Cir.1984); Jones v. City of Lubbock, 727 F.2d 364, 369 (5th Cir. 1984). Subsection (b) provides that the Act is violated "if, based on the totality of circumstances, it is shown that the political processes *937 leading to nomination or election in the State or political subdivision are not equally open to participation by [minorities]."
For plaintiffs to succeed in a § 2 challenge, plaintiffs must show, based on the totality of the circumstances, that "members [of a protected class] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The Supreme Court first considered the amended version of § 1973 in Thornburg v. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Gingles involved a challenge to several multi-member state General Assembly districts in North Carolina. While recognizing that all of the factors listed in the Senate Report accompanying the amendments to the Act may be relevant to a claim of vote dilution, the Court held that the existence of certain circumstances was a necessary precondition to establishing a claim of vote dilution. These are referred to as the "Gingles preconditions" or the "threshold factors." Specifically, the Supreme Court stated that in order to bring a successful § 2 challenge in a case such as this:[3]
[1] ... the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district. If it is not, as would be the case in a substantially integrated district, the multimember form of the district cannot be responsible for minority voters' inability to elect its candidates;
[2] ... the minority group must be able to show that it is politically cohesive. If the minority group is not politically cohesive, it cannot be said that the selection of a multimember electoral structure thwarts distinctive minority group interests; [and]
[3] ... the minority must be able to demonstrate the white majority votes sufficiently as a bloc to enable it  in the absence of special circumstances, such as the minority candidate running unopposed  usually to defeat the minority's preferred candidate. In establishing this last circumstance, the minority group demonstrates that submergence in a white multimember district impedes its ability to elect its chosen representatives.
Id. at 50-51, 106 S.Ct. at 2766-67. The parties concede that the first of the three threshold factors is satisfied here. Therefore, the Court's analysis of this § 2 challenge turns on the two remaining threshold factors.
A violation of § 2 need not be proved by evidence of a discriminatory intent, rather a showing of discriminatory effect may be sufficient. Id. at 35, 106 S.Ct. at 2758. Therefore, courts generally examine actual election returns in analyzing the Gingles preconditions. See Gingles, 478 U.S. at 63, 106 S.Ct. at 2772; Collins v. City of Norfolk, 816 F.2d 932, 935 (4th Cir.1987); Smith v. Clinton, 687 F.Supp. 1310, 1317 (E.D.Ark.1988). A court analyzing the second Gingles precondition, minority political cohesiveness, should look only to actual voting patterns rather than speculating as to the reasons why many minorities fail to vote. Gomez v. City of Watsonville, 863 F.2d 1407, 1416 (9th Cir.1988), cert. denied, 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989). Likewise, a court analyzing the third Gingles precondition, the effect of majority bloc voting, should identify the preferred minority candidate by analysis of actual votes cast rather than speculating why some minority voters choose not to cast ballots. See, e.g., Collins, 816 F.2d at 937-38 (candidate who receives most minority votes is preferred minority candidate); Jeffers v. Clinton, 730 F.Supp. 196, 208-09 (E.D.Ark.1989) (three-judge panel) (examining previous election returns and considering only the preferences of the minority voters who voted), aff'd, 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991). With these factors in mind, the *938 Court will consider whether plaintiffs have made the necessary threshold showing.

Threshold Factor II: Minority Voter Cohesion
To establish the second threshold factor, plaintiffs must demonstrate that minority voters are politically cohesive. Gingles, 478 U.S. at 51, 106 S.Ct. at 2766. The Supreme Court suggests that "a showing that a significant number of minority group members usually vote for the same candidates is one way of proving the political cohesiveness necessary to a vote dilution claim...." Gingles, 478 U.S. at 56, 106 S.Ct. at 2769. Both parties introduced expert testimony and lay testimony on the issue of the political cohesiveness of the African-American community in St. Louis. Plaintiffs' expert, Dr. Warren, did not define or specify criteria as to what constitutes cohesive behavior on the part of voters. However, at page seven of his expert report, he states that "the African-American community has demonstrated political cohesion." Ptf.Exh. 1 at p. 7. In support of that contention, Dr. Warren assembled various accounts of election results from exogenous, or non-Board, elections and Board elections. This data indicates how each candidate fared in the "predominantly African-American" wards. While these exogenous elections properly may be considered as additional evidence of bloc voting, they are insufficient alone to support a finding of racially polarized voting in Board elections. Cf. Jenkins v. Red Clay Consol. School Dist. Bd. of Educ., 4 F.3d 1103, 1121 (3rd Cir.1993). Further, data from Board elections reflects that African-American voters and white voters prefer the same candidate on many occasions.
In addition to an extreme case or homogenous precinct analysis, defendant's expert, Dr. Weber, performed a bivariate ecological regression analysis on all contested Board elections since 1977 and all Democratic primary and general elections for the City of St. Louis since 1986. As part of that analysis, Dr. Weber clearly set forth the criteria for characterizing a particular voting groups' conduct as "strongly cohesive" and "moderately cohesive." The standards utilized by Dr. Weber for characterizing voter conduct is consistent with the expert testimony offered on behalf of the plaintiff in Jenkins. See, Jenkins v. Red Clay Consol. School Dist. Bd. of Educ., 780 F.Supp. 221, 227 (D.Del.1991), rev'd on other grounds, 4 F.3d 1103 (3rd Cir.1993). Several other Courts have relied on the analytical methods employed in Jenkins. See, e.g., Harvell v. Blytheville School District, 33 F.3d 910, 914-15 (8th Cir.1994); Clarke v. Cincinnati, 40 F.3d 807, 810 (6th Cir.1994). Based on this criteria, Dr. Weber concluded and the Court finds that in the eleven contested Board elections conducted between 1977 and 1995, African-American voters' voting habits were at least moderately cohesive in five of those elections.
Dr. Weber also provided the Court with election data from twenty-one contested, exogenous elections, in which at least one African-American candidate participated, occurring between 1986 and 1993. In twenty of those twenty-one elections, African-American voters were at least moderately cohesive. As indicated above, these exogenous elections are not dispositive of bloc voting. Cf. Jenkins, 4 F.3d at 1121.
Based on the election results from both Board elections and exogenous elections, the Court finds that a preponderance of the evidence supports the existence of the second Gingles factor. In almost half of the Board elections conducted since 1977 and in almost all of the exogenous elections conducted since 1986 and analyzed by defendant's expert, there is evidence of minority cohesion. Simply stated, the statistically adduced percentage of African-American votes each candidate receives indicates that members of the African-American community in St. Louis generally favor the same candidates. Consequently, the Court finds that African-American voters vote in a sufficiently cohesive fashion in Board elections to satisfy the second threshold requirement.

Threshold Factor III  White Bloc Voting
The parties also offered expert testimony with respect to the third Gingles factor. In making a finding on this final threshold issue, the Court considers whether white voters in the City of St. Louis vote in a manner which usually allows the white majority *939 to defeat African-American voters' candidates of choice. Gingles, 478 U.S. at 51, 106 S.Ct. at 2766. This necessarily requires that, as an initial matter, the Court identify the African-American minority's candidates of choice. Jenkins, 4 F.3d at 1126. In elaborating on the burden a plaintiff faces in attempting to establish the third Gingles factor, the Supreme Court noted that "there is no simple doctrinal test for the existence of legally significant racial bloc voting." Id. at 58, 106 S.Ct. at 2770. However, in an effort to guide litigants, the Supreme Court set out the following general principles for determining whether legally significant white bloc voting exists:
[I]n general, a white bloc vote that normally will defeat the combined strength of minority support plus white "crossover" votes rises to the level of legally significant white bloc voting. The amount of white bloc voting that can generally "minimize or cancel" black voters' ability to elect representatives of their choice, however, will vary from district to district according to a number of factors....
Because loss of political power through vote dilution is distinct from the mere inability to win a particular election, a pattern of racial bloc voting that extends over a period of time is more probative of a claim that a district experiences legally significant polarization than are the results of a single election. Also for this reason, in a district where elections are shown usually to be polarized, the fact that racially polarized voting is not present in one or a few individual elections does not necessarily negate the conclusion that the district experiences legally significant bloc voting.
Id. at 56-57, 106 S.Ct. at 2769-70 (citations and footnotes omitted).
In attempting to establish the existence of legally significant white bloc voting, plaintiffs introduced expert testimony, which included graphic representations of statistical analyses of a number of both Board elections and exogenous elections. This evidence was accompanied by lay testimony. Plaintiffs' evidence of minority political cohesiveness is related to their evidence concerning the second threshold factor because if the minority community is not politically cohesive, it would be impossible to identify a candidate who can be said to be the minority's candidate of choice.
In considering the testimony of plaintiffs' expert and his statistical analyses, the Court makes several general observations. First, and perhaps most critical, Dr. Warren fails to explicitly identify who the minority candidates of choice are or how he would make such a determination. Plaintiffs bear the burden of "establishing on an election-by-election basis, by a preponderance of the evidence, which African-American candidates are minority preferred." Jenkins, 4 F.3d at 1126, citing, Gingles, 478 U.S. at 46, 106 S.Ct. at 2764. Plaintiffs simply fail to do so.
Instead of identifying the minority candidates of choice, plaintiffs rely on the common presumption that the minority candidates are the candidates of choice among the minority community. This presumption greatly reduces plaintiffs' burden of identifying the minority-preferred candidates. However, the presumption alone is insufficient to label each minority candidate the candidate choice of minority voters. See, e.g., Jenkins, 4 F.3d at 1126; see also Jeffers, 730 F.Supp. at 208. Rather, this Court agrees with the Sixth Circuit that "blacks' preferred candidates simply [are] those candidates who receive the greatest support from black voters." Clarke v. Cincinnati, 40 F.3d at 810 n. 1, citing Jenkins, 4 F.3d at 1127. Further, applying the standard from Clarke, actual election results fail to consistently support plaintiffs' presumption. As indicated above, in several elections, African-American voters included a white candidate among their preferred candidates.
Second, Dr. Warren bases his statistical analysis on data obtained from "ward clusters." The record does not contain a definition of a ward cluster. However, it is clear that a ward cluster is comprised of several precincts. The flaw in Dr. Warrens' reliance on the ward clusters is that it ignores the fact that within a given cluster of wards, there may be precincts which are less than 90% single-race, the standard for performing a homogenous analysis. Also, reliance on ward clusters limits an analysis of the mixed *940 wards, which might contain some homogenous white precincts and some homogenous African-American precincts.
Third, the bulk of Dr. Warren's report focuses on exogenous elections. As indicated above, such an analysis is not irrelevant, but should only be offered to supplement the analyses of the specific elections at issue, here Board elections. Cf. Jenkins, 4 F.3d at 1121. Finally, the Court notes with some concern Dr. Warren's statement during cross-examination that he was engaged by plaintiffs on a contingency basis and would be compensated only if plaintiffs prevailed. However, notwithstanding this concern, the Court proceeds to consider plaintiffs' expert's testimony and report.
Dr. Warren concluded and the Court finds that from 1981 through 1993 a minority candidate won only 31.4% of the thirty-five elections for eleven different city-wide offices. However, the significance of this statistic is diminished by the fact that this figure fails to indicate which candidates were preferred by African-American voters. In support of his analysis, Dr. Warren refers to a "Minority Representation Score," which represents the difference between the African-American population and the African-American candidates' success rate. Dr. Warren has not cited a single case relying on or referring to this Minority Representation Score, and the Court's own research has not revealed any court relying on such a calculation. Essentially, the point of Dr. Warren's analysis of exogenous elections appears to be that in single-member, at-large elections, there is nothing short of redefining the structure of the office which might accomplish proportionate representation. Dr. Warren argues that, with regard to elections for single-member offices, the white majority, with its higher voter turnout, can always defeat the African-American minority, which generally has a lower voter turnout  there are simply more white voters who vote. However, Dr. Warren asserts that in elections for multimember offices, where more than one position is vacant, efforts should be made to assist minorities in being elected. Dr. Warren's focus on the race of the candidate may not be entirely appropriate, in light of the disagreement as to the relevance of the candidate's race. See Clarke, 40 F.3d at 811.
Dr. Warren also provides data on three elections related to public school finance, Propositions 1, 2, and 3. Dr. Warren admits that African-American voters overwhelmingly supported these issues and in fact all three were passed. He attempts to diminish the significance of these victories for minority voters by claiming, without support, that "historically issues favorable to the African-American community, especially school issues, ... have failed." Ptf.Exh. 1 at p. 22. This assertion is not persuasive.
Dr. Warren also analyzed Board elections for the period 1983 through 1995. During that period, twenty-six candidates ran for Board positions, yet only eight minority candidates won. In analyzing the elections conducted during this period, Dr. Warren failed to consider those elections which were uncontested. If an election is uncontested, then it cannot be asserted that the minority community's candidate of choice was defeated. Further, as noted above, Dr. Warren fails to identify which candidates were preferred by the minority community, thus eliminating the possibility that the candidate of choice might have been white.
Ultimately, the Court is not persuaded by Dr. Warren's focus on the race of the particular candidate and whether that candidate was successful. Dr. Warren affords little or no significance to how individual voters of a particular race voted. Instead, based on the total number of votes a given candidate received, Dr. Warren generalizes about how voters of a given race voted.
In contrast, defendant's expert, Dr. Weber, identified the minority-preferred candidates based on the criteria noted above from Clarke. Clearly, there is no way to ascertain how each individual voter voted. However, Dr. Weber utilized statistical analysis to estimate how voters of a given race cast their ballots. Based on this data, Dr. Weber was able to identify the candidates of choice and which of those minority-preferred candidates were successful. Further, Dr. Weber generated his data from the precinct level, which is smaller and theoretically more homogenous than the larger ward clusters relied on by *941 Dr. Warren. Finally, Dr. Weber considered only the contested elections, excluding those races in which a candidate ran unopposed.
The Court has carefully reviewed Dr. Weber's method and the data generated by his statistical method and finds the report very persuasive. Relying on Dr. Weber's report, the Court finds that African-American voters elected their preferred candidates to the Board 57.9% of the time. Further, when African-American voters voted cohesively, they were able to elect their preferred candidate to the Board 80% of the time. These facts clearly do not support a finding that "the white majority voters vote sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." Gingles, 478 U.S. at 50-51, 106 S.Ct. at 2766-67.

Totality of the Circumstances
In the alternative, if this Court were to find that plaintiffs have satisfied all three threshold factors set forth in Gingles, plaintiffs still bear the burden of establishing a § 2 violation in light of the "totality of the circumstances." The report of the Senate Judiciary Committee (the "Report") accompanying the bill that amended § 2 sets forth several factors that might be probative of a § 2 violation. The Report lists the following factors, which are often referred to as the "Zimmer factors:"[4]
1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction.
S.Rep. No. 417, at 28-29, H.R.Rep. No. 227, at 30, reprinted in 1982 U.S.Code Cong. & Ad.News at 206-07; see Jones v. City of Lubbock, 727 F.2d at 379. Congress also cited two other factors which might have limited relevance:
[a.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
[b.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, standard, practice or procedure is tenuous.
S.Rep. No. 417, at 29, reprinted in 1982 U.S.Code Cong. & Ad.News at 207. Congress made clear, however, that these factors are not exhaustive, that other factors may be indicative of a violation, and that there is no formula for aggregating the factors. Id.; United States v. Marengo County Comm'n, 731 F.2d at 1574.
"[I]t would be a highly unusual case in which a plaintiff successfully proved the existence of the three Gingles factors and still failed to establish a violation." See Baird v. Consolidated City of Indianapolis, *942 976 F.2d 357, 359 (7th Cir.1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2334, 124 L.Ed.2d 246 (1993). Further, in reviewing the Zimmer factors, the Eighth Circuit has mandated that this Court engage in a very detailed factual finding to support its consideration of the totality of the circumstances. Buckanaga v. Sisseton Indep. Sch. Dist. No. 54-5, 804 F.2d 469, 472 (8th Cir.1986). As the Fifth Circuit has noted,
[because] Congress was concerned not only with present discrimination, but with the vestiges of discrimination which may interact with present political structures to perpetuate a historical lack of access to the political system[,] ... the court must provide a sounder basis for its conclusion than its personal opinion that discrimination has been eradicated in the recent past.
Westwego Citizens for Better Government v. City of Westwego, 872 F.2d 1201, 1211-12 (5th Cir.1989). With these principles in mind, the Court proceeds to consider the totality of the circumstances surrounding plaintiffs' vote dilution claim.

1. The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process.
Upon careful review of the record, the Court finds that the parties have adduced no evidence on this factor. Because plaintiffs bear the burden of proof, the absence of proof on this factor militates against finding in favor of plaintiffs.

2. The extent to which voting in the elections of the state or political subdivision is racially polarized.
The Court addressed the issue of voter polarization above. There are clear instances when African-American and white voters vote for different candidates. However, in the context of a multimember Board election, defendant has demonstrated that any such "polarized voting" does not result in the consistent defeat of minority-backed candidates.

3. The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group.
Both the plurality voting rule, under which the top four finishers are deemed successful, and bullet voting, where voters may elect to cast less than all four votes, are present in Board elections. However, plaintiffs offered no evidence of the impact of either of these voting practices or procedures on the minority vote. Dr. Weber's analysis indicated that bullet voting may actually aid minority voters in electing their candidates of choice.

4. If there is a candidate slating process, whether the members of the minority group have been denied access to that process.
Both parties concede the existence of at least an informal slating process. Plaintiffs offered lay testimony that minority members are excluded from the slating process. However, in light of the racial composition of the various slating groups which formed slates for the 1989, 1991, 1993, and 1995 elections, the Court finds this assertion unpersuasive. Further, plaintiffs offered voluminous financial disclosure records from the Board of Elections which suggest that major civic leaders and corporations formed and backed the various slates. However, even assuming the truth of plaintiffs' assertion that minority voters are excluded from the slating process, election results from 1989, 1991, 1993, and 1995 indicate that the slated candidates are often the candidates of choice of the minority community.

5. The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process.
The Senate Report accompanying the amendments to the Voting Rights Act notes that:

*943 [C]ourts have recognized that disproportionate educational, employment, income level and living conditions arising from past discrimination tend to depress minority political participation. Where these conditions are shown, and where the level of black participation in politics is depressed, plaintiffs need not prove any further causal nexus between their disparate socio-economic status and the depressed level of political participation.
S.Rep. No. 417 at 29, (emphasis added), reprinted in 1982 U.S.Code Cong. & Ad.News at 207 n. 114. This statement requires plaintiffs to prove that African-American participation in the political process is in fact depressed. See, e.g., League of United Latin American Citizens v. Clements, 999 F.2d 831, 867 (5th Cir.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 878, 128 L.Ed.2d 74 (1994).
While defendant concedes a history of past discrimination in areas such as education generally, the record fails to support a finding that African-American access to the political process is impaired. In an effort to support its assertion that such discrimination has hindered the ability of minorities to participate in the political process, plaintiffs offer only evidence of low voter turnout. While low minority voter turnout may evidence an electoral scheme in which minorities lack an equal opportunity to participate in the electoral process, Gomez v. City of Watsonville, 863 F.2d 1407, 1416 n. 4 (citing Gingles, 478 U.S. at 38-39, 106 S.Ct. at 2759-60), this Court must consider only the choices of those minority voters who actually voted, rather than engaging in speculation concerning the causes of minority voter apathy. Consequently, the Court finds this contention unpersuasive and this factor unsatisfied.

6. Whether political campaigns have been characterized by overt or subtle racial appeals.
While the Court heard some evidence concerning the existence of racial issues in a few Board elections, those instances appear limited, and plaintiffs have not presented any evidence of pervasive racial issues infecting Board elections. Furthermore, debate over issues such as busing and school desegregation reflects legitimate public concern, while also having an undeniable racial dimension. Plaintiffs have not presented any evidence to suggest that such issues have been raised in an effort to appeal to members of a particular race. The absence of evidence on this factor militates against plaintiffs, who bear the burden of proof.

7. The extent to which members of the minority group have been elected to public office in the jurisdiction.
This factor has already been considered above, both in the context of the relevant Board elections and in the context of exogenous elections. The Court found above that in contested Board elections conducted from 1977-1995, candidates preferred by African-American voters are elected 57.9% of the time. Eleven of the thirty-eight Board elections during the period 1977-1995 were won by an African-American candidate.
Finally, with regard to the two additional factors, cited by Congress, plaintiffs have not presented any evidence to support a finding that elected officials in the City of St. Louis are unresponsive to the needs of the minority community or that the policy underlying the Board's current, at-large, multimember election procedure is tenuous. Consequently, this Court finds that the totality of the circumstances does not support a finding of a § 2 violation.
In response to plaintiffs' complaint, defendant also asserts that after the 1995 election, the number of African-American members on the Board is essentially proportionate to the African-American composition of the voting age population, so that there can be no § 2 violation. In Johnson v. De Grandy, the Supreme Court indicated that even if a plaintiff succeeds in establishing the Gingles preconditions, a defendant may be able to defeat a § 2 claim by showing that the minority group in question has achieved, or will achieve, substantially proportional representation under the challenged districting plan. See Johnson v. De Grandy, ___ U.S. ___, ___ _ ___, 114 S.Ct. 2647, 2658-59, 129 L.Ed.2d 775 (1994) (substantial proportionality, in absence of discriminatory practices by State, is convincing proof of equal opportunity to elect candidates of choice). However, *944 proportionality is only one factor in the totality of circumstances. It is not a "safe harbor" that automatically defeats a claim of vote dilution:
While ... proportionality is not dispositive in a challenge to single-member districting, it is a relevant fact in the totality of circumstances to be analyzed when determining whether members of a minority group have `less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'
Id. (citation omitted); see id. at ___, 114 S.Ct. at 2659. The ultimate question is whether the result of manipulation of district lines "interacting with social and historical conditions impairs the ability of a protected class to elect its candidate of choice on an equal basis with other voters." Id. at ___, 114 S.Ct. at 2655 (internal citation, quotation and modification omitted).
While proportionate representation on the Board is not a "safe harbor" in and of itself, in this case, the sustained electoral success by minority-preferred candidates in Board elections is simply inconsistent with a § 2 violation. The record fails to support a finding that African-American voters have less opportunity to elect representatives of their choice. In the 1995 election, when African-American representation on the Board approximated the proportion of African-Americans in the voting age population, African-Americans were able to elect three of the four candidates they preferred, two of whom were African-American. The 1995 election was not the first time African-Americans have enjoyed such success in electing their preferred candidates. Rather prior to 1995, African-Americans were able to elect their preferred candidate to the Board in over 50% of the contested elections.
In addition to their claims under the Act, plaintiffs have asserted constitutional claims in their complaint, both of which the Court finds to be without merit.[5] First, the Court is not persuaded that the Fifteenth Amendment applies to vote dilution claims, or, if so, to what extent. See Shaw v. Reno, ___ U.S. ___, ___ _ ___, 113 S.Ct. 2816, 2822-24, 125 L.Ed.2d 511 (1993) (discussing Fifteenth Amendment at length with respect to racial gerrymandering, but ultimately deciding case on Fourteenth Amendment grounds); Voinovich v. Quilter, ___ U.S. ___, ___, 113 S.Ct. 1149, 1158, 122 L.Ed.2d 500 (1993) ("This Court has not decided whether the Fifteenth Amendment applies to vote-dilution claims; in fact, we never have held any legislative apportionment inconsistent with the Fifteenth Amendment.") (citation omitted). Insofar as the present action is concerned, the Court concludes that the Fifteenth Amendment's prohibition against "purposeful discriminatory denial or abridgement by government of the freedom to vote `on account of race, color, or previous condition of servitude'" is subsumed in the analysis required under the Fourteenth Amendment's equal protection clause. Mobile v. Bolden, 446 U.S. 55, 65, 100 S.Ct. 1490, 1498, 64 L.Ed.2d 47 (1980) (quoting the Fifteenth Amendment); see also Turner v. Arkansas, 784 F.Supp. 553, 578-79 (E.D.Ark.1991) (three-judge court) (proof of conscious racial discrimination required in both Fourteenth and Fifteenth Amendment cases), aff'd mem., 504 U.S. 952, 112 S.Ct. 2296, 119 L.Ed.2d 220 (1992).
To make out a claim under the Fourteenth Amendment, the plaintiffs must show: (1) intentional discrimination; and (2) a resultant discriminatory effect. Davis v. Bandemer, 478 U.S. 109, 127, 106 S.Ct. 2797, 2807, 92 L.Ed.2d 85 (1986). "In order for the Equal Protection Clause to be violated, `the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose.'" Rogers v. Lodge, 458 U.S. 613, 617, 102 S.Ct. 3272, 3275, 73 L.Ed.2d 1012 (1982), quoting, Washington v. Davis, 426 U.S. 229, 240, 96 S.Ct. 2040, 2048, 48 L.Ed.2d 597 (1976). "The ultimate issue in a case alleging unconstitutional vote dilution of the votes of a racial group is whether the [voting scheme or procedure] under attack exists because it was intended to diminish or dilute the political *945 efficacy of that group." Rogers, 458 U.S. at 621, 102 S.Ct. at 3277, quoting, Nevett v. Sides, 571 F.2d 209, 226 (5th Cir.1978), cert. denied, 446 U.S. 951, 100 S.Ct. 2916, 64 L.Ed.2d 807 (1980).
For plaintiffs to succeed on this Fourteenth Amendment challenge, they must demonstrate, by a preponderance of the evidence, a racially discriminatory motive behind the enactment of the challenged election procedures. Here, a discriminatory purpose, if found, need only be a motivating factor in its decision to conduct at-large elections; it need not be the sole or even primary factor in that decision in order to find a violation of the Fourteenth Amendment. Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252, 265-66, 97 S.Ct. 555, 563-64, 50 L.Ed.2d 450 (1977). A discriminatory purpose, as a motivating factor, "implies more than intent as volition or intent as awareness of consequences." Personnel Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Rather, it implies that the decision-maker "selected or reaffirmed a particular course of action at least in part `because of,' not merely `in spite of,' its adverse effects upon an identifiable group." Id.
Plaintiffs' Fourteenth Amendment claim fails because they have presented no evidence of intentional discrimination, and, as indicated above, the record fails to support a finding of a discriminatory effect. African-Americans have attained elected positions both within the City government and on the Board. The current minority membership on the Board is approximately proportional to the minority proportion of the population. Further, African-Americans hold two of the most important and powerful positions in City government, Mayor and Comptroller. Based on these facts, the Court is not persuaded that the election system discriminates against African-Americans in violation of the Fourteenth Amendment.
In an effort to demonstrate intentional discrimination, plaintiffs argue that the voting system was originally changed "to dilute the voting strength of ethnic minorities deemed by a (white) elitist majority to be inferior or otherwise less desirable." Ptf. Proposed Findings of Fact, p. 8 at ¶ 24. This change, which plaintiffs seek to explain, occurred in 1897, almost one hundred years ago. Plaintiffs now argue, without any support, that the reason for that change to an at-large election system almost one hundred years ago gives rise to a finding today that the adopted system violates the Fourteenth Amendment. The Court finds this argument unpersuasive and consequently finds that plaintiffs fail to establish a Fourteenth Amendment violation.
The Court also notes that several weeks following the conclusion of the trial and the filing of the post-trial briefs, plaintiffs filed a motion to strike the affidavit of Earl E. Nance, Jr., which was attached to defendant's post-trial brief. The affidavit was offered essentially to rebut the lay testimony offered by plaintiffs at trial. Because this is a non-jury trial, the Court will accept the affidavit, as well as the lay testimony, and afford each only so much weight as they deserve. Therefore, for purposes of these proceedings, it is unnecessary to strike the affidavit.
For all the foregoing reasons, the Court finds that plaintiffs have failed to satisfy the threshold requirements for a successful § 2 challenge. Further, the Court finds no evidence of a Constitutional deprivation. Finally, for the reasons stated above, the Court will deny plaintiffs' motion to strike the affidavit of Earl E. Nance, Jr.
Accordingly,
IT IS HEREBY ORDERED that plaintiffs' motion to strike the affidavit of Earl E. Nance, Jr. [Doc. # 61] is denied.
NOTES
[1] All individual defendants were dismissed by order dated July 24, 1991. Therefore, at this stage, there remains only one defendant.
[2] Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2) of this title, as provided in subsection (b).
(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
42 U.S.C. § 1973.
[3] The claim addressed in this case, similar to Gingles, is one in which the plaintiffs alleged and attempted to prove that their ability to elect the representative of their choice was impaired by the use of an at-large electoral system. The Court has no occasion to consider other electoral schemes that might constitute a violation of § 2, thus the Court does not speculate on the application of the Gingles analysis to other alleged § 2 violations. See Gingles, 478 U.S. at 46 n. 12, 106 S.Ct. at 2764 n. 12.
[4] These factors were derived from the analytical framework of White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), as refined and developed by the lower courts, in particular by the Fifth Circuit in Zimmer v. McKeithen, 485 F.2d 1297 (1973) (en banc), aff'd sub nom. East Carroll Parish School Board v. Marshall, 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). S.Rep., at 28, n. 113.
[5] The Court notes that plaintiffs offered no argument on their Constitutional claims at trial, thus it is unclear whether plaintiffs have abandoned these claims.